IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DONNA JONES,                          §
                                      §
          Plaintiff,                  §
                                      §
v.                                    §          CIVIL NO. H-09-0656
                                      §
MICHAEL ASTRUE,                       §
COMMISSIONER OF THE                   §
SOCIAL SECURITY ADMINISTRATION,       §
                                      §
          Defendant.                  §

<u>**MEMORANDUM OPINION**</u>

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 13) and Plaintiff's Motion for Summary Judgment (Docket Entry No. 15). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **GRANTS** Defendant's motion and **DENIES** Plaintiff's motion.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner") regarding Plaintiff's claim for disability benefits under Title II of the Social Security Act ("the Act").

## A.  <u>Factual History</u>

---

[1]     The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Docket Entry Nos. 11-12.

Plaintiff was born on April 1, 1957, and was forty-three years old on December 15, 2000, the date of the alleged onset of disability.[2]   Plaintiff completed high school, two years of college, and banking courses.[3]   Prior to her alleged onset of disability, Plaintiff worked as a bank teller, a new accounts clerk, and a retail cashier.[4]

### 1.   Back Pain and Headaches

The record generally supports Plaintiff's claims.  The onset of Plaintiff's headaches and back pain dates to two car accidents in the 1990s.[5]  In 1992, Plaintiff was in an automobile accident and, a week later, began experiencing headaches.[6]   A second accident in 1998 caused Plaintiff injuries as well.[7]  After the second accident, her headaches occurred at least two times a week.[8]

In an assessment dated July 28, 1999, Plaintiff reported experiencing relief from the back pain with physical therapy but stated that the pain would return when she increased her

---

[2]      See Transcript of the Administrative Proceedings ("Tr.") 138.

[3]      See Tr. 150, 187, 761.

[4]      See Tr. 145, 157, 224, 799.

[5]      See Tr. 222, 765-67.

[6]      See Tr. 765; but see Tr. 651 (stating in a note by Athar H. Syed, M.D., that Plaintiff was experiencing such "severe disabling post-spinal headaches" in June 1991 that he ordered complete bed rest).

[7]      See Tr. 767.

[8]      See Tr. 768.

activities.[9]   A  physical  examination  at  that  time  revealed "palpable  muscular  spasm  in  the  upper  cervical  paraspinals," pain associated  with  lateral  and  forward  flexion  movements,  and localized pain on foraminal compression.[10]  The diagnosis given was cervical  spine  sprain,  cervical  radiculopathy,  and  thoracic  spine sprain.[11]

An  electromyogram  (EMG)  performed  in  December  2000  showed "fairly  normal  insertional  activity  in  the  extremity  muscles, however  insertional  activity  was  noted  in  the  par[a]vertebral muscles on the right side, in the lower cervical and supper [sic] dorsal region."[12]  In  January  2001,  multiple  magnetic  resonance images ("MRI") of Plaintiff's cervical spine revealed spondylosis, degenerative disc disease, and bulged discs.[13]

Athar H. Syed, M.D., ("Dr. Syed") wrote a letter in January 2002 in which he stated that he had performed numerous tests on Plaintiff  and  had  determined  that  she  suffered  from  "disabling cluster  migraine  headaches."[14]   The  supporting  objective  medical evidence  is  absent  from  the  medical  record.   The  only  evidence  of

---

[9]    See Tr. 646.

[10]    Id.

[11]    See id.

[12]    Tr. 191.

[13]    See Tr. 195.

[14]    See Tr. 190.

3

any objective medical test performed by Dr. Syed is the December 2000 electromyogram.[15]  Unfortunately, the record copy of the report is incomplete[16] and only mentions Plaintiff's headaches as a presenting symptom without providing any diagnostic impression on them.[17]

In early 2002, a physician at New Vision Health Care Clinic completed a work status report restricting Plaintiff's lifting, bending, standing, climbing, pushing, and pulling due to "severe damage to cervical spine and migraines."[18]  The physician opined that Plaintiff was "[u]nable to return to work until further notice."[19]

Computerized tomography (CT) scans taken in April 2002 showed "preserved vertebral bodies, interspaces, alignment and paravertebral soft tissues" and "mid lumbar scoliosis with convexity to the left."[20]  The scans revealed no disc herniation or spinal cord compression or displacement, and the scan of the lumbar spine seemed normal.[21]

---

[15]     See Tr. 191.

[16]     The copy in the medical record is one page and, at the bottom, has the words "final impression" followed by a colon but nothing else.  See Tr. 191.

[17]     See id.

[18]     Tr. 193.

[19]     Id.

[20]     Tr. 194.

[21]     See id.

Another MRI of Plaintiff's cervical spine was taken on April 29, 2003, and revealed no abnormalities at C2-3 and no disc herniation at C3-4 and C4-5.[22]  At C5-6, the scan indicated slight loss of disc height, soft tissue and bony spondylosis with slightly bulging disc and, at C6-7, slight soft tissue and bony spondylotic changes.[23]  The scan of C7-T1 was unremarkable.[24]  On February 2, 2004, Albert Pulliam, M.D., issued a letter stating that Plaintiff had been a patient of Affordable Healthcare Clinic since May 23, 2002, and was being treated for back pain and anxiety attacks.[25]

D.P. Sunkara, M.D., ("Dr. Sunkara") examined Plaintiff on November 30, 2004, at the request of the Texas Rehabilitation Commission.[26]  As relevant to internal medicine, Plaintiff identified cervical degenerative disc disease, migraines, hepatitis C, arthritis, and lupus as impairments.[27]  At that time, she complained of constant, fairly intense neck and back pain.[28]  She also reported having migraine headaches two weeks in a month.[29] Dr. Sunkara assessed Plaintiff to be able to "sit, stand and move

---

[22]    See Tr. 196.

[23]    See id.

[24]    See id.

[25]    See Tr. 219.

[26]    See 229-31.

[27]    See Tr. 229.

[28]    See id.

[29]    See id.

about" with normal range of motion, normal gait, full grip strength, and full ability "to reach, handle, finger and feel."[30]

In November 2004, Plaintiff reported to an examining physician that she was unable to afford Imitrex, a headache medication, while telling an examining psychologist earlier that month that she was on Imitrex.[31]

### 2. Depression

One son's death and another's incarceration in 1999 led Plaintiff to seek mental health treatment.[32] A Mental Health Mental Retardation Authority ("MHMRA") provider assessed Plaintiff in April 2000, nearly a year after her son's death.[33] Plaintiff reported depressed mood, sadness, crying, hopelessness, sleep disturbance, weight loss, and fatigue.[34] The patient note from that date states that Plaintiff attempted suicide in 1995 but was not experiencing suicidal ideation at the time of the assessment.[35] The prognosis was "[g]uarded due to her grief and financial problems."[36] The assessor, a licensed professional counselor, recommended

---

[30]   Tr. 231.

[31]   Compare Tr. 229 with Tr. 222.

[32]   See Tr. 223, 303, 768.

[33]   See Tr. 302-08.

[34]   See Tr. 303.

[35]   See id.

[36]   Tr. 306.

6

continued medication and individual therapy, finding Plaintiff unable to work until further evaluation.[37]

During a psychological evaluation in October 2000, Plaintiff "report[ed] suicidal ideations [sic] and gestures on at least two different occasions" but denied current suicidal tendencies.[38] Based on his observations and a mental status examination, the examining psychologist, Jim C. Whitley, Ed.D., ("Dr. Whitley"), opined that Plaintiff was "extremely depressed" and was "experiencing a lot of post traumatic stress disorder symptoms with bad dreams, nightmares, and recurring thoughts with regard to the death of her son."[39] Dr. Whitley recommended antidepressive medication, a psychiatric evaluation, and counseling.[40] He concluded that Plaintiff's prognosis for joining the work force at that time was "not very good."[41]

The record includes two assessments by two different MHMRA providers performed on the same day in February 2001.[42] One provider found her global assessment of functioning (GAF) score to be forty-five out of one hundred, reflecting severe symptoms.[43] The

---

[37]   See Tr. 302, 307.

[38]   Tr. 188.

[39]   Tr. 189.

[40]   See id.

[41]   Id.

[42]   See Tr. 271-82.

[43]   See Tr. 281.

other provider opined that it was fifty, a score at the upper end of the severe category.[44]  One of the providers noted a history of good compliance with treatment recommendations while the other noted poor compliance.[45]  One assessor noted suicide attempts in 1989 and 1998.[46]

The absence of any MHMRA records for the period February 2001 to July 2003 suggests that there was a gap in MHMRA treatment for over two years.  A note from July 2003 reflects a GAF score of forty-eight and states, "Patient is in no condition to work or do any community service because of her mental health."[47]  Notes from October and December 2003 indicate a successful response to medications.[48]  Marsha Wheatley, M.D., ("Dr. Wheatley") of MHMRA began treating Plaintiff in December 2003.[49]  In January 2004, Dr. Wheatley assessed Plaintiff's GAF score to be fifty.[50]

Plaintiff did not show up for her appointments in February and March 2004.[51]  Dr. Wheatley saw Plaintiff in April, July, and

---

[44]    See Tr. 275.

[45]    Compare Tr. 273 with Tr. 279.

[46]    See Tr. 277.

[47]    Tr. 270.

[48]    See Tr. 265, 268.

[49]    See Tr. 265-66.

[50]    See Tr. 263.

[51]    See Tr. 261-62.

September 2004, noting no significant changes in her condition.[52] The doctor opined, on each of those occasions, that Plaintiff was unable to work.[53]  Notes from a medication management appointment in September 2004 provide little insight into Plaintiff's status.[54] In October 2004, Plaintiff's symptoms, depression, and overall functioning were in the moderate range.[55]

In November 2004, Mark Lehman, Ph.D., ("Dr. Lehman") evaluated Plaintiff.[56]  He recounted Plaintiff's report of experiencing a "'nervous breakdown' characterized by suicidal ideation and depression" after the death of one son and the incarceration of the other.[57]  MHMRA providers monitored her psychiatric medications, which were Xanax, Prozac, and Wellbutrin XL.[58]  Plaintiff told Dr. Lehman that she had attempted suicide on five previous occasions and had been hospitalized on three separate occasions following suicide attempts.[59]

---

[52]    See Tr. 249, 255, 258.

[53]    See id.

[54]    See Tr. 245-46

[55]    See Tr. 244.

[56]    See Tr. 221-27.

[57]    See Tr. 222.

[58]    See id.

[59]    See id.

Dr. Lehman concluded that Plaintiff suffered from major depressive disorder and mood disorder due to medical problems.[60] He stated that her depression should continue to respond to mental health intervention and medications.[61]

In December 2004, Dr. Wheatley classified Plaintiff's appetite, guilt, suicidal ideation, lack of motivation, and psychomotor slowing/agitation as ones on a zero-to-three scale and her insomnia, mood, concentration, and fatigability as twos.[62] Plaintiff's overall functioning was in the low-to-moderate range, according to the doctor.[63] Dr. Wheatley also noted that Plaintiff was medication-seeking and needed help with redirection.[64]

A February 2005 note by Dr. Wheatley indicated that Plaintiff's depressive symptoms improved, specifically her mood and concentration.[65] Dr. Wheatley assessed Plaintiff's overall functioning to be in the low-to-moderate range and found that she fully responded to medication.[66]

**3.  Other Impairments**

---

[60]   See Tr. 226.

[61]   See id.

[62]   See Tr. 240-41.

[63]   See Tr. 241.

[64]   See Tr. 242.

[65]   Compare Tr. 234-35 with Tr. 240-41.

[66]   See Tr. 235.

The record also contains some suggestion, either medical evidence or self-reports, of hypothyroidism, hepatitis C, lupus, and hypercholesteremia.[67]  It appears that only the hypothyroidism was ever treated with medication.[68]  As of November 2004, Plaintiff was not on any hepatitis C medication and was not experiencing nausea, vomiting, diarrhea, weight loss, or gastrointestinal bleeding.[69]

In early 2005, Dr. Wheatley confronted Plaintiff about her "lack of prioritization of needs," in particular noting her failure to address her hepatits C or thyroid imbalance.[70]  The doctor noted that Plaintiff had a "hierarchy of excuses," none of which explained how she was "able to do everyt[h]ing but renew gold card to gain access to treatment."[71]

**B.  Procedural History**

Plaintiff filed for disability benefits on September 9, 2004, claiming an inability to work since December 15, 2000, due to clinical depression, nerve damage and degenerated disc in the cervical spine, cluster migraines, hepatitis C, arthritis, and

---

[67]     See Tr. 192, 193, 208, 211, 213-15, 263.

[68]     See Tr. 222, 229-30, 235, 628.

[69]     See Tr. 229.

[70]     Tr. 235.

[71]     Id.

lupus.[72]  Based on her earnings record, Plaintiff remained insured through December 31, 2004.[73]   Thus, the relevant period for determining Plaintiff's disability status is December 15, 2000, through the end of 2004.[74]

In connection with her application, Plaintiff completed two questionnaires in which she described her daily activities.[75] Therein, she reported that, on some days, she had difficulty getting out of bed and she cried a lot.[76]  Plaintiff stated that, on "normal" days, she had difficulty with good hygiene, her husband helped with meal preparation, grocery shopping, yard work, and car repair, but she was able to perform "regular house chores," to take care of her dog, and to attend church up to three times a week.[77] In November 2004, Plaintiff reported to Dr. Lehman that, on good days, she could straighten up her house, do laundry, prepare meals, wash dishes, dust, and watch television.[78]

---

[72]     See Tr. 138-40, 144.

[73]     See Tr. 25.

[74]     In order to qualify for disability insurance benefits, the claimant must prove that the onset of her disability was on or before the date on which she was last insured.  Loza v. Apfel, 219 F.3d 378, 394 (5th Cir. 2000).

[75]     See Tr. 153-56, 165-66.  Another questionnaire completed in March 2005 reflects that her level of activity remained constant for the six months since she had filed for disability benefits.  See Tr. 174-77.

[76]     See Tr. 154.

[77]     See Tr. 154-55, 165.

[78]     See Tr. 223.

A December 2004 analysis by an agency doctor states that
Plaintiff had the following medically determinable impairments:
joint and neck pain, migraines, and hepatitis C.[79]   The medical
reviewer found Plaintiff's impairments to be nonsevere.[80]   In
January 2005, a psychiatric RFC form was completed by a
psychologist, M. Chappuis, Ph.D., ("Dr. Chappuis").[81] Dr. Chappuis
determined that Plaintiff's mental health impairment was not severe
but was moderate and under partial control through medication.[82]
Plaintiff had mild degrees of limitation in activities of daily
living, maintaining social functioning, and maintaining
concentration, persistence, or pace, according to the psychologist,
and no episodes of decompensation.[83]

The Commissioner denied Plaintiff's application at the initial
and reconsideration levels.[84]   In April 2005, Plaintiff requested
a hearing before an administrative law judge ("ALJ") of the Social
Security Administration.[85]   The ALJ granted Plaintiff's request and
conducted a hearing on November 6, 2006.[86]   Fifteen days after the

---

[79]     See Tr. 323.

[80]     See id.

[81]     See Tr. 309-22.

[82]     See Tr. 309, 312.

[83]     See Tr. 319.

[84]     See Tr. 59-60, 118-21, 131-35.

[85]     See Tr. 117.

[86]     See Tr. 105-08, 115-16.

hearing, the ALJ issued an unfavorable decision, which Plaintiff appealed.[87]

The Appeals Council vacated the ALJ's decision and remanded Plaintiff's case for resolution of several issues.[88]  In particular, the Appeals Council ordered the ALJ to give further consideration to the treating source opinions, to evaluate further Plaintiff's subjective complaints and her mental impairment, and to solicit additional information from a vocational expert.[89]

In accordance with the Appeals Council's order, the ALJ scheduled a second hearing.[90]  Plaintiff did not attend due to a migraine.[91]  After holding a show-cause hearing on Plaintiff's failure to appear, the ALJ reset the disability hearing for March 25, 2008.[92]  Plaintiff, two medical experts, and a vocational expert testified at the March 2008 hearing.[93]

At the hearing, Plaintiff reported having experienced three headaches that week.[94]  She explained that the headaches gradually had increased in intensity over the years since she first started

---

[87]    See Tr. 46-55, 102-03.

[88]    See Tr. 80-81.

[89]    See Tr. 82-83.

[90]    See Tr. 70-73.

[91]    See Tr. 68-69, 731.

[92]    See Tr. 33-41, 727-749.

[93]    See Tr. 750-813.

[94]    See Tr. 765.

14

experiencing them in 1992.[95]  Plaintiff stated that she missed three to four work days a week in 1999 due to headaches.[96]  She described the headaches as lasting for a whole day at a time, during which time she could not tolerate motion, light, or noise, was unable to eat or drink, and vomited three or four times.[97]  Imitrex was at least partially successful in treating the headaches, Plaintiff said, but it was too expensive to purchase without insurance.[98]

As for her other physical limitations, Plaintiff stated that she could not lift anything over five to ten pounds, and, as a result of worsening scoliosis, she frequently tripped and fell.[99] Plaintiff reported that physical therapy had helped in the past with her back pain.[100]

After her son died in 1999, Plaintiff testified, she began experiencing uncontrollable crying spells, which interrupted her at work and forced her to take breaks.[101]  Plaintiff said that her medications caused her to be a little groggy in the mornings and to be fatigued all the time.[102]  Even so, she said she prepared meals

---

[95]     See Tr. 766.

[96]     See Tr. 769.

[97]     See Tr. 770.

[98]     See Tr. 770, 773.

[99]     See Tr. 772.

[100]    See id.

[101]    See Tr. 768, 775-6.

[102]    See Tr. 773.

with her husband's assistance, cleaned the house a little, seldom drove a car, and shopped with her father and husband.[103]

The medical expert who testified first, Stephen Goldstein, M.D., ("ME Goldstein"), stated that the record did not show that Plaintiff suffered from cluster headaches, which are a type of migraine headache, but that she has migraine headaches.[104] The record also did not indicate that she experienced frequent headaches, he said, opining, "[S]he's not going for medical treatment for her headaches so frequently that I would think it would keep her from functioning, from what I can see from the record."[105] He also stated that he would expect someone with Plaintiff's subjective complaints to be on a prophylactic medication for headaches.[106]

ME Goldstein found that Plaintiff did not meet any listing in the regulations (the "Listings"),[107] in particular, Listing 1.04 for spondylosis.[108] Although no Listing applies to headaches, ME Goldstein considered whether the headache pain "would be disabling"

---

[103]    See Tr. 774.

[104]    See Tr. 754-55.

[105]    Tr. 754, 756.

[106]    See Tr. 784.   Plaintiff interrupted ME Goldstein's list of prophylactic medications by responding that she had tried each, but the doctors took her off of them because of low blood pressure.   See Tr. 784-85.   When asked whether the record reflected these medication trials, ME Goldstein said that he had not seen anything in the doctors' notes.   See Tr. 785.

[107]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[108]    See Tr. 782.

and whether Plaintiff would be unable "to concentrate and function because of the severe pain."[109]   He concluded that, due to the subjective nature of Plaintiff's pain, it would not meet a Listing.[110]   Regarding her RFC, ME Goldstein determined that she was capable of light work without any restriction.

Another medical expert, Rahn Bailey, M.D., ("ME Bailey") focused on Plaintiff's psychiatric problems.[111]   He noted that Plaintiff had a family history of depression, had been on a variety of antidepressive and anti-anxiety medications, and had a fairly extensive history of clinical evaluations and assessments at MHMRA.[112]   ME Bailey found that her depression was severe but opined that Plaintiff did not meet Listing 12.04 for depression because she had not been psychotic, had not been hospitalized, and was not suicidal.[113]   However, he indicated that two of Plaintiff's prescribed antidepressant medications frequently caused headaches.[114]   Therefore, he considered whether the combination of

---

[109]   Id.

[110]   See id.

[111]   See Tr. 755-58, 787-98.

[112]   See Tr. 789.

[113]   See Tr. 755-58, 790-91.   ME Bailey did note that, according to Plaintiff's self-report, she had been hospitalized three times for suicide attempts, but nothing in the record supported that.   See Tr. 790.

[114]   See Tr. 755-57, 789-90.

depression and headaches could medically equal Listing 12.04 and concluded that they did not.[115]

Plaintiff experienced high-level depression for a period of time, but, according to ME Bailey, it did not meet the duration requirements of the Act.[116]   The record reflected, he testified, that medication lowered the level of severity to moderate, where it remained for the majority of the relevant period.[117]   ME Bailey gave the following testimony regarding Plaintiff's mental RFC:

> [I]t would be my opinion the psychiatry concerns would imply her ability to follow work rules would be average; ability to relate to coworkers, based on this chart, would be average; her ability to deal with the public would be below average; her ability to use judgment would be average; interact with supervisors, average; deal with work stressors, below average; function independently, average; and maintain attention and concentration, below average.   Number two, making performance adjustments: understand, remember, and carry out complex job instructions, I would list that as below average; understand, remember, and carry out detailed but not complex job instruction, I list that at average; and understand, remember and carry out simple job instruction, I list that as average.   Under number three, making occupational adjustments:   perform one- and two-step operations, yes; understand, remember, and carry out simple instructions, yes; respond appropriately to supervision and coworkers, yes; perform routine, repetitive tasks, yes; and function in a low-stress work setting where pub[l]ic contact is minimal, yes.[118]

---

[115]   <u>See</u> Tr. 755-58, 790-91, 797.

[116]   <u>See</u> Tr. 793.

[117]   <u>See</u> <u>id.</u>

[118]   Tr. 791-92.

Plaintiff's attorney questioned ME Bailey on the definition of "below average."[119]  He explained that it indicated "some level of substantive impairment bordering on marked," which he further defined as "severely impaired but not precluded."[120]

After hearing the foregoing testimony, the vocational expert, Thomas King ("VE King"), classified all of Plaintiff's prior work as semiskilled.[121]  According to VE King, the bank teller position was performed at the medium exertional level; the retail cashier/clerk position was performed at the light exertional level; and the new accounts clerk position was performed at the sedentary exertional level.[122]

Based on the combined physical and mental RFC assessments of the two medical experts, VE King found that Plaintiff could not perform her past relevant work, but that she could perform a full range of light, unskilled work such as office helper and mail clerk.[123]  When pressed by the ALJ to quantify ME Bailey's "below average" definitions, VE King stated that he could not because the

---

[119]    See Tr. 807-08.

[120]    Tr. 808.

[121]    See Tr. 799.

[122]    See id.

[123]    See Tr. 806-07.

19

definition was "too subjective" and, although it was clear she had some deficit, he could not say how significant it was.[124]

The ALJ then focused the vocational expert's attention on the testimony by ME Bailey that Plaintiff could perform one- and two-step operations, could understand, remember, and carry out simple instructions, could respond appropriately to supervision and coworkers, could perform routine, repetitive tasks, and could function in a low-stress work setting where public contact is minimal.[125] If she could make those five occupational adjustments, even with "some below-average ability," VE King opined, Plaintiff could perform unskilled work.[126]

On April 16, 2008, after giving further consideration to the issues identified by the Appeals Council, the ALJ issued an unfavorable decision.[127] In May, Plaintiff appealed the April 2008 ALJ's decision and requested extensions of time to review the hearing tapes and file a brief.[128] After allowing Plaintiff time to submit additional information, the Appeals Council notified Plaintiff that it had granted the request for review.[129]   On

---

[124]   See Tr. 809.

[125]   See Tr. 792, 809-10.

[126]   See Tr. 809-10.

[127]   See Tr. 22-32.

[128]   See Tr. 13, 16, 19, 21.

[129]   See Tr. 8, 14-15, 17-18, 668-71.

December 19, 2008, the Appeals Council issued an unfavorable decision, which became the final decision of the Commissioner.[130] Having exhausted all administrative remedies,[131] Plaintiff brought this civil action for review of the Commissioner's decision.[132]

### C.   Commissioner's Decision

In his April 2008 decision, the ALJ found that Plaintiff met the requirements for insured status on the alleged onset date of disability and continuing through December 31, 2004.[133]   The ALJ also found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that she had a combination of impairments ("hepatitis C, depression, chronic neck and back pain, and headaches") that was severe but that these impairments individually or in combination did not meet any Listing.[134]

In reviewing the Listing criteria, the ALJ found that the evidence showed that Plaintiff had mild restrictions in activities of daily living and in social functioning but that she had moderate difficulties with concentration, persistence, or pace.[135]   The ALJ

---

[130]   See Tr. 5-12.   The Appeals Council's decision to review or not to review is binding unless one of the parties files an action in federal district court.   See 20 C.F.R. § 404.981.

[131]   See Harper v. Bowen, 813 F.2d 737, 739 (5th Cir. 1987), for a summary of the administrative steps a disability claimant must take in order to exhaust her administrative remedies.

[132]   Plaintiff's Original Complaint, Docket Entry No. 1.

[133]   See Tr. 25.

[134]   See Tr. 27-28.

[135]   See Tr. 28.

found no evidence of episodes of decompensation.[136]   Because Plaintiff did not have marked restriction in any of those functional categories and did not experience repeated episodes of decompensation, the ALJ found she did not meet the "paragraph B" criteria of Listing 12.04.[137]

As for residual functional capacity ("RFC"), the ALJ determined that Plaintiff could perform light work and had:

> an average ability to follow work rules, relate to coworkers, use judgment, cooperate with supervisors, function independently, do detailed but not complex job instructions and do simple job instructions and a below average ability to deal with the public, deal with work pressures, maintain attention and concentration, and do complex job instructions.   [Plaintiff] can perform routine repetitive tasks and one [and] two-step operations in a low stress work environment with minimal public contact.   [Plaintiff] can function appropriately with coworkers and supervisors.[138]

The ALJ found Plaintiff's complaints of pain to be credible only to the extent of causing her to be unable to perform heavy or medium work but "not credible to the extent that they preclude all work activities."[139]   He also noted that Plaintiff had worked with headaches in the past and relied on ME Goldstein's opinion that the frequency and severity of headaches as reported by Plaintiff was

---

[136]     See id.

[137]     See id.

[138]     Tr. 28-29.

[139]     Tr. 30.

not documented in the medical record.[140]   Regarding Plaintiff's mental health impairments, the ALJ accepted the testimony of ME Bailey that claimant's depression was most severe immediately following the death of her son but was ameliorated by medication and, thus, did not meet the Act's duration requirements.[141]

The ALJ concluded that Plaintiff's past relevant work as a retail clerk/cashier and new accounts clerk did not require her to perform any activities precluded by the above RFC.[142]   Accordingly, the ALJ found that Plaintiff was not disabled during the relevant period.[143]

On review, the Appeals Council entered a decision adopting the ALJ's conclusion that Plaintiff was not disabled during the relevant period.[144]   The Appeals Council agreed with the ALJ's findings regarding the first three steps of the five-step analysis, Plaintiff's credibility, and Plaintiff's RFC.[145]   However, the Appeals Council did not agree fully with the ALJ's decision and found, contrary to the ALJ, that Plaintiff was not capable of performing her past relevant work because of her limitation with

---

[140]   See id.

[141]   See Tr. 31.

[142]   See id.

[143]   See Tr. 32.

[144]   See Tr. 8-11.

[145]   See id.

regard to public contact.[146]   Having disagreed with the ALJ on the fourth step, the Appeals Council continued the analysis to consider whether Plaintiff was capable of performing other jobs that existed in significant numbers in the national economy.[147]   The vocational expert's testimony, according to the Appeals Council, supported a finding that Plaintiff could perform the jobs of mail clerk, sorter, and office helper.[148]   The Appeals Council determined that Plaintiff was not disabled under the Act.[149]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) substantial evidence in the record supports the decision; and 2) the ALJ applied proper legal standards in evaluating the evidence.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In addition to the initial disability determination, the Social Security Administration periodically reviews continued entitlement to disability benefits.  See 20 C.F.R. § 404.1594(a).

## A.  Substantial Evidence

The widely accepted definition of "substantial evidence" is

---

[146]    See Tr. 8-9.

[147]    See Tr. 9.

[148]    See id.

[149]    See id.

"that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion," <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." <u>Id.</u>  The Commissioner has the responsibility of deciding any conflict in the evidence. <u>Id.</u>  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown</u>, 192 F.3d at 496.  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

## B.  <u>Legal Standard</u>

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498. If the

Commissioner satisfies his step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested.  <u>Muse v. Sullivan</u>, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  <u>Greenspan</u>, 38 F.3d at 236.

### III.  Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.  Specifically, Plaintiff argues that the ALJ's RFC finding was contradictory and not supported by substantial evidence and that the ALJ erred in finding that Plaintiff retained the ability to perform her past relevant work.  Defendant points out that the Appeals Council adopted the ALJ's RFC but vacated the ALJ's finding that Plaintiff was capable of performing her past work.  The Appeals Council determined, instead, that Plaintiff was capable of performing light, unskilled work available in the national economy.  Defendant contends that the Appeals Council's decision is supported by the vocational expert's opinion.

A claimant's RFC is her remaining ability to work despite all of her limitations resulting from her impairment.  <u>See</u> 20 C.F.R. § 404.1545(a); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1023 (5th Cir. 1990).

In evaluating the claimant's RFC, the ALJ is directed by the regulations to consider how the claimant's impairment affects her physical, mental, and other abilities, as well as the total limiting effects of her impairment. See 20 C.F.R. § 404.1545. The testimony of a medical expert, as long as it does not contradict the findings of an examining physician, is substantial evidence in support of the ALJ's RFC determination. See Villa, 895 F.2d at 1024 (stating that the "ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and do not contradict those of the examining physician").

After arriving at an RFC that takes into account all of the restrictions "reasonably warranted by the evidence," an ALJ may rely on the response of a vocational expert to a hypothetical question on job availability as it relates to a person with the claimant's limitations. Dominque v. Barnhart, 388 F.3d 462, 463 (5th Cir. 2004); see also Masterson v. Barnhart, 309 F.3d 267, 273-74 (5th Cir. 2002). In order to serve as substantial evidence, the vocational expert's testimony must be based on a hypothetical question that incorporates all of the limitations recognized by the ALJ and must be subject to the claimant's cross-examination. See Masterson, 309 F.3d at 274; Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001).

The Commissioner appropriately applied these legal standards in this case.  The ALJ formulated Plaintiff's RFC by combining the assessments of MEs Goldstein and Bailey regarding Plaintiff's remaining ability.  ME Goldstein testified that Plaintiff's remaining physical ability would allow her to perform a full range of light work.  ME Bailey assessed her as capable of performing one- and two-step operations, understanding, remembering, and carrying out simple instructions, responding appropriately to supervision and coworkers, performing routine, repetitive tasks, and functioning in a low-stress work setting where public contact is minimal.  ME Bailey opined that Plaintiff had an average ability in each of the following seven areas:  following work rules; relating to coworkers; using judgment; cooperating with supervisors; functioning independently; performing detailed but not complex job instructions; and performing simple job instructions. He found her ability in four other areas to be below average: dealing with the public; dealing with work pressures; maintaining attention and concentration; and performing complex job instructions.

Plaintiff takes issue with the ALJ's use of the terms "average" and "below average," claiming that they are too vague to allow VE King to apply the limitations in determining Plaintiff's ability to perform work.  The court understands Plaintiff's concern, particularly in light of VE King's admission that he was

unable to quantify the stated deficiencies in the below-average categories into job-specific terms even after ME Bailey's attempts to better define the term "below average."

However, VE King did not rest on that testimony. He reached a definitive opinion on Plaintiff's ability to perform work based on the five areas that ME Bailey found Plaintiff capable of performing. VE King stated that, with those areas of capability, a hypothetical individual could perform unskilled work even if she had "some below-average ability."[150] Because the testimony of ME Bailey and VE Goldstein comported with proper legal standards and did not conflict with record evidence, the Commissioner was entitled to rely on their testimony in reaching a decision concerning Plaintiff's ability to work.

Plaintiff also challenges the ALJ's RFC finding because, she argues, a "moderate" limitation in concentration, persistence, and pace is inconsistent with a finding that Plaintiff had an "average" ability to perform "detailed" work.

The ALJ relied on ME Bailey's testimony in evaluating Plaintiff's abilities with regard to the criteria identified in paragraph B of Listing 12.04. One of those criteria is concentration, persistence, or pace, a category in which Plaintiff had moderate difficulties according to the ALJ. The ALJ and ME Bailey incorporated that finding in Plaintiff's RFC by listing her

---

[150]   Tr. 809.

ability to maintain attention and concentration as below average. They assessed her ability to do detailed but not complex job instructions as average.

These two findings are not inherently contradictory. She may be able to complete detailed noncomplex, or simple, job instructions with only a below average ability in concentration, persistence, and pace. More importantly, the out-of-circuit case law proffered by Plaintiff in support of this argument is inapposite.

The unpublished district court case cited by Plaintiff addressed a situation in which the ALJ's hypothetical question failed to include the ALJ's finding that the claimant had a moderate limitation in concentration, persistence, and pace. See Keiderling v. Astrue, Civil Action No. 07-2237, 2008 WL 2120154, at *7 (E.D. Pa. May 20, 2008). Rather than include that limitation, the ALJ in that case simply limited the claimant to work that did not involve detailed instructions. See id. Thus, the court found that the ALJ erred by failing to incorporate all of the claimant's medically established limitations in the hypothetical question, and the vocational expert's response could not serve as substantial evidence in support of the ALJ's opinion. See id.

The Keiderling opinion relied on the law of the United States Court of Appeals for the Third Circuit that "expressly held that a hypothetical question limiting a claimant to simple, repetitive,

31

one to two step tasks is not sufficient to encompass a claimant's impairments where the ALJ has found that he or she 'often' suffered from deficiencies in concentration, persistence and pace." Id. (citing Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir. 2004)). The error in those cases was that the RFC did not encompass all of the limitations supported by the record and recognized by the ALJ. See Keiderling, 2008 WL 2120154, at *7 (citing several district court opinions). The point was not that a below-average ability in concentration, persistence, and pace was inconsistent with a finding that a claimant could perform simple, detailed work instructions but that the claimant's limitation in concentration, persistence, and pace had been omitted from the hypothetical question.

Here, the ALJ, echoing the RFC findings of ME Bailey, included both a below average ability in concentration, persistence, or pace and a limitation to only simple, detailed work. The ALJ committed no error in doing so.

Finally, Plaintiff challenges the ALJ's finding that Plaintiff could perform her past relevant work. The court agrees, as did the Appeals Council, that the ALJ erred in reaching that conclusion. Plaintiff's nonexertional limitations, particularly those related to public contact, precluded her from performing any of those prior jobs. The Appeals Council reversed the ALJ's decision in this regard and continued the analysis through step five. Based on VE

King's testimony that Plaintiff could perform unskilled, light work despite her limitations, the Appeals Council found Plaintiff to be capable of jobs such as those identified by VE King.

This court agrees with the Appeals Council, for the reasons explained above, that VE King's testimony provides substantial evidence that Plaintiff was capable of working as a mail clerk, sorter, and office helper.   Therefore, Plaintiff was not disabled under the Act.

Accordingly, the court finds that Plaintiff is not entitled to summary judgment.   Defendant also moves for summary judgment. Having found that the ALJ's decision contains no legal error and is supported by substantial evidence, the court finds that Defendant's summary judgment motion should be granted.

### IV.  Conclusion

Based on the foregoing, the court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion.

**SIGNED** in Houston, Texas, this 31st day of March, 2010.

Nancy K. Johnson
United States Magistrate Judge

33